UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TORTILLA FACTORY, LLC, | ) | Case No. CV 17-7539 FMO (GJSx) |
| Plaintiff, | ) | |
| v. | ) | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| GT'S LIVING FOODS, LLC, | ) | |
| Defendant. | ) | |

**INTRODUCTION**

On October 14, 2017, Tortilla Factory ("plaintiff" or "Tortilla Factory"), a California-based limited liability company, filed this action against GT's Living Foods, LLC ("defendant" or "GT's"). (See Dkt. 1, Complaint For Damages and Equitable Relief). On February 26, 2018, Tortilla Factory filed the operative Second Amended Complaint for Damages and Equitable Relief ("SAC"), asserting claims for: (1) false advertising and unfair competition under § 43(a) of the Lanham Act, ("Lanham Act"), 15 U.S.C. § 1125(a); (2) unfair competition under Cal. Bus. & Prof. Code § 17200 ("UCL"); (3) intentional interference with prospective economic relations; and (4) negligent interference with prospective economic relations. (See Dkt. 34, SAC at ¶¶ 61-99). Tortilla Factory seeks compensatory and punitive damages, equitable relief, and attorney's fees and costs. (See id. at 20-21).

A liability-only bench trial was held on June 7 and 8, 2022, on Tortilla Factory's Lanham Act

and UCL claims. (See Dkt. 348, Pretrial Conference Order ("PTCO") at ¶¶ 3-4 & 7-8). Tortilla Factory abandoned its claim for damages under the Lanham Act, (see Dkt. 333, Court's Order of June 3, 2022), and is pursuing its UCL claim under the unlawful and false advertising prongs. (See Dkt. 348, PTCO at ¶¶ 3-4 & 7-8).

Having reviewed and considered all the evidence presented during the bench trial, and the contentions and arguments of counsel, the court hereby makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.[1] Because the court finds that Tortilla Factory failed to meet its burden of proving that it suffered competitive harm proximately caused by GT's labeling and representations regarding its Classic and Enlightened products, the court will address only those facts and arguments regarding this element.

## FINDINGS OF FACT

I. BACKGROUND.

1. Kombucha is a fermented beverage made using a combination of tea and sugar sources that, when fermented over time with a symbiotic culture of bacteria and yeast, creates acetic acids and natural effervescence. (See Dkt. 363, Reporter's Transcript of Bench Trial Proceedings, Day One ("RT I") at 31-33).

2. As a fermented beverage, all kombucha contains naturally occurring alcohol. (Dkt. 348, PTCO at ¶ 12).

3. Tortilla Factory is a limited liability company with an office in Los Angeles, California. (Dkt. 348, PTCO at ¶ 1).

4. Michael Faye, the principal of Tortilla Factory, began manufacturing and selling kombucha beverages in 2013, at his location in downtown Los Angeles, which previously housed a tortilla-making factory. (Dkt. 348, PTCO at ¶ 2).

---

[1] Any finding of fact that more correctly constitutes a conclusion of law, and any conclusion of law that more correctly constitutes a finding of fact, should be treated as such.

2

5. "Kombucha Dog" is the brand name of Tortilla Factory's kombucha products. (Dkt. 348, PTCO at ¶ 3).

6. Mr. Faye has been a professional photographer for over 30 years, and the labels on the Kombucha Dog products display Mr. Faye's photographs of rescue dogs available for adoption. (Dkt. 348, PTCO at ¶ 4).

7. Kombucha Dog has approximately 1.25% alcohol by volume ("ABV"). (Dkt. 363, RT I at 36). It is sold as an alcoholic beverage, with a government-required label that includes the following language:

> GOVERNMENT WARNING: (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) Consumption of alcoholic beverages impairs your ability to drive a car or operate machinery, and may cause health problems.

(Dkt. 348, PTCO at ¶ 5).

8. On October 31, 2016, Tortilla Factory entered into an exclusive distribution deal with Young's Market Company ("Young's Market" or "Young's") to distribute Kombucha Dog. (See Dkt. 363, RT I at 102-04).

9. By 2017, Tortilla Factory's agreement with Young's Market was a "disaster[.]" (See Dkt. 363, RT I at 106); (Exhibit ("Exh.") 1089); (Exh. 88). There were "scores of Kombucha Dog accounts that Young's allowed to go cold," meaning that "Young's did not provide th[ose] accounts with service[,]" (Dkt. 363, RT I at 114), and those "accounts died[.]" (Id. at 115); (Exh. 33) ("Young's Cold Accounts").

10. GT's is a Delaware Limited Liability Company registered with the California Secretary of State, with its principal place of business in Vernon, California. (Dkt. 348, PTCO at ¶ 6).

11. George Dave is GT's owner and founder. (Dkt. 363, RT I at 224).

12. GT's began selling kombucha products in 1995, (Dkt. 348, PTCO at ¶ 7), and was the first commercial kombucha company in the United States. (See Dkt. 367, Reporter's Transcript of Bench Trial Proceedings, Day Two ("RT II") at 28).

13. GT's manufactures three separate lines of kombucha products: (1) Enlightened (now called "Synergy")[2] kombucha; (2) Classic kombucha; and (3) Hard kombucha. (Dkt. 348, PTCO at ¶ 8). Only GT's Enlightened/Synergy and Classic kombucha are relevant to this case.

14. GT's introduced the Classic line in 2011. (Dkt. 367, RT II at 40). It was the first alcoholic-labeled kombucha on the market. (Id. at 41).

15. GT's Classic kombucha is an alcoholic beverage that contains over 0.5% ABV. (Dkt. 348, PTCO ¶ 9). The labels on GT's Classic bottles display the following government-required warning:

> GOVERNMENT WARNING: (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) Consumption of alcoholic beverages impairs your ability to drive a car or operate machinery, and may cause health problems.

(Dkt. 348, PTCO ¶ 10).

II. THE KOMBUCHA MARKET.

16. There are approximately 300 plus kombucha brands in the United States. (Dkt. 367, RT II at 40).

17. In 2013, there was an influx of kombucha brands, which included companies that were backed by Coke and Pepsi. (See Dkt. 367, RT II at 38-39).

18. California is "the most competitive of all the states" because "there's a lot of local brands in California." (Dkt. 363, RT I at 243).

19. GT's is the leading kombucha seller in the United States, with a market share of about 50 percent as of 2018. (See Dkt. 363, RT I at 242-244).

20. Kombucha Dog's market is limited to Southern California, primarily Los Angeles. (See Dkt. 363, RT I at 78-79).

///

---

[2] The court will refer to Enlightened and Synergy interchangeably.

III. SPECIFIC CUSTOMER ACCOUNTS.

A. Lightning in the Bottle.

21. Lightning in a Bottle is an annual music festival held in the Central Valley region of California. (Dkt. 348, PTCO ¶ 13).

22. Tortilla Factory sold Kombucha Dog at the Lightning in a Bottle festival in 2014 and 2015. (Dkt. 348, PTCO ¶ 14). It did not sell kombucha at Lightning in a Bottle after 2015. (Id. at PTCO ¶ 17).

23. GT's began selling kombucha at Lightning in the Bottle in 2014. (Dkt. 367, RT II at 73). GT's sold kombucha out of kegs instead of bottles. (See id. at 74, 76-77); (id. at 92) (Mr. Dave agreeing during cross examination that GT's sold Enlightened "through the keg"). The kegs were transported directly from GT's facility using a sprinter van that allowed them to keep the kegs refrigerated. (See id. at 74-75).

24. GT's developed a specific flavor – Golden Sage – for the 2016 festival. That flavor has never been sold commercially in retail. (Dkt. 367, RT II at 75).

25. For the 2017 festival, GT's developed another flavor, Liberty, which is available as a summer seasonal flavor. (Dkt. 367, RT II at 76).

26. The Lightning in a Bottle festival did not occur in 2020 or 2021. (Dkt. 348, PTCO ¶ 18).

B. Tender Greens.

27. Tender Greens is a "fast causal" restaurant chain. (Dkt. 367, RT II at 71-72).

28. Tortilla Factory sold Kombucha Dog in five Tender Greens locations in 2013 and 2014. (Dkt. 363, RT I at 67).

29. Tender Greens asked Tortilla Factory if it "could match marketing dollars," which Mr. Faye "underst[ood]" to be prohibited under "federal alcoholic" laws. (See Dkt. 363, RT I at 67-68).

30. Tender Greens requested that GT's pay for menu boards, which GT's agreed to do. (See Dkt. 363, RT I at 248-49); (Dkt. 367, RT II at 72-73); (Exh. 23). Because "there's a cost involved . . . to change the name on the menu board which is on the wall at . . . Tender Greens[,]" Tender Greens charged GT's "the cost to effectively put [GT's] name on the menu board." (Dkt. 367, RT II at 72-73). GT's started supplying Tender Greens with Enlightened kombucha in 2014

or 2015.  (See Dkt. 363, RT I at 248-49); (Dkt. 367, RT II at 71).

31. The kombucha GT's provided to Tender Greens was contained in kegs. (Dkt. 367, RT II at 72) ("Q: And you supplied them with kegs?  A: Yes."); (id. at 92) ("Q: And at Tender Greens, in fact, Enlightened was sold through the keg, correct?  A: That's correct.").

C. Café Gratitude.

32. Tortilla Factory sold Kombucha Dog at Café Gratitude from early 2014 to 2016.  (Dkt. 363, RT I at 68).

33. Tortilla Factory is no longer sold at Café Gratitude because Café Gratitude did not have an "off-premises alcohol license," which it needed to sell Kombucha Dog "to-go."  (Dkt. 363, RT I at 68); (id. at 142) (Mr. Faye testified that "Café Gratitude was buying Kombucha from us, and then they were putting it into a kiosk – a to-go kiosk."); (id. at 143) (Mr. Faye testifying that Kombucha Dog should not have been placed in the to-go kiosks "because [Café Gratitude] didn't have the correct license to sell alcohol to go.").

34. After Kombucha Dog was no longer available at Café Gratitude, GT's Enlightened was sold in Café Gratitude's to-go kiosk.  (Dkt. 363, RT I at 68).

35. GT's has sold kombucha – both Classic and Enlightened – at Café Gratitude on and off.  (Dkt. 367, RT II at 78); (id. at 78-79) (Mr. Dave testimony that Café Gratitude tends to rotate is suppliers).

D. Jimbo's.

36. GT's sold its kombucha at Jimbo's market since approximately 1999.  (See Dkt. 367, RT II at 82) (Mr. Dave testifying that was one of GT's "early, early stores, even before Whole Foods"); (id. at 32) (Mr. Dave testifying that in 1999, GT's got into Whole Foods); (see also Dkt. 363, RT I at 126) (Mr. Faye admitted that GT's was already in Jimbo's) ("Q: And GT's was already in Jimbo's, correct?  A: Yes.").

37. Tortilla Factory sold Kombucha Dog at Jimbo's market from 2014 through 2017.  (Dkt. 363, RT I at 69).

///

6

**CONCLUSIONS OF LAW**

I.  LIABILITY UNDER THE LANHAM ACT.

38. "The Lanham Act creates a cause of action for unfair competition through misleading advertising or labeling. Though in the end consumers also benefit from the Act's proper enforcement, the cause of action is for competitors, not consumers." POM Wonderful LLC v. Coca-Cola Co., 573 U.S. 102, 107, 134 S.Ct. 2228, 2234 (2014); see id at 106, 134 S.Ct. at 2233 ("[Section] 43 of the Lanham Act . . . allows one competitor to sue another if it alleges unfair competition arising from false or misleading product descriptions.") (citation omitted).

39. "The elements of a Lanham Act § 43(a) false advertising claim are: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997) (footnotes omitted).

40. "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 140, 134 S.Ct. 1377, 1395 (2014). Here, the court finds that Tortilla Factory has failed to establish the last element of its Lanham Act claim – that it has been or is likely to be injured as a result of GT's labeling.

A.  "Corrective" Advertising.

41. Tortilla Factory contends that it suffered competitive harm because it expended significant amounts on corrective advertising. (See Dkt. 369, Plaintiff Tortilla Factory, LLC's Memorandum of Points and Authorities Re: Bench Trial – Liability ("TF Memo.") at 19-20). Mr. Faye testified that Tortilla Factory has spent money since 2013 on sales material to educate consumers "about undiluted and authentic Kombucha," and about sugar. (See Dkt. 363, RT I at

51-54); (id. at 52) (testifying that Tortilla Factory spent money on advertising and educating sales force regarding sugar content); (Exh. 232) ("promotional piece"); (Exhs. 96-100) (Tortilla Factory management reports from 2013 to 2017). However, the court did not find credible Mr. Faye's testimony that Tortilla Factory engaged in "corrective advertising" as opposed to typical advertising undertaken by any small business entering a competitive market.[3]

42. The management reports relied on by Tortilla Factory do not compel a different conclusion, as they simply include a line item for sales and marketing. (See Exh. 96, 2013 Management Report at TF002308); (Exh. 97, 2014 Management Report at TF002319); (Exh. 98, 2015 Management Report at TF002337); (Exh. 99, 2016 Management Report at TF 2355); (Exh. 100, 2017 Management Report at TF002372). In other words, the court cannot assume, based on the management reports, that the purpose of plaintiff's advertising was to combat GT's alleged false advertising.

B. Alcohol Representations and Labeling.[4]

43. With respect to Tortilla Factory's contentions regarding representations about the amount of alcohol in, and the lack of a government alcohol warning label on, GT's Enlightened products, the court agrees with GT's that a customer who purportedly purchased GT's Enlightened kombucha because it lacked an alcohol warning label would not, as an alternative, purchased Kombucha Dog, an alcoholic product.[5] A customer who wished to purchase nonalcoholic kombucha would have instead purchased one of dozens of available nonalcoholic kombucha

---

[3] Also, as GT's notes, (see Dkt. 372, GT's Living Foods, LLC's Memorandum of Points and Authorities Re: Bench Trial – Liability ("GT's Memo.") at 16 n. 7), the SAC does not mention alleged costs associated with corrective advertising. (See, generally, Dkt. 34, SAC at ¶ 73 & Prayer for Relief). Moreover, according to GT's, Tortilla Factory did not identify corrective-advertising costs in its initial disclosures. (See Dkt. 372, GT's Memo. at 16 n. 7).

[4] Tortilla Factory's claims regarding GT's representations as to the alcohol content of its kombucha drinks apply only to GT's Enlightened products. As noted above, GT's Classic products are labeled as alcoholic and bear the government alcohol warning label.

[5] However, plaintiff's evidence, including the testimony of its testing expert, Blake Ebersole, regarding the alcohol and sugar levels in GT's Enlightened products is credible and compelling. (See, e.g., RT I at 154-222); (Dkt. 367, RT II at 228-245) (testimony of Mr. Ebersole). The lack of harm is what dooms plaintiff's case.

drinks in the market, including Health-Ade and KeVita. (See Dkt. 372, GT's Memo. at 11) (Dkt. 363, RT I at 75-76) ("Q: There are many Kombucha brands in L.A. that are not marketed as alcoholic beverages, correct? A: Yes. Q: More than just GT's, correct? A: Yes."); (see also Dkt. 367, RT II at 39) (Mr. Dave testified that in 2013, there was an influx of kombucha brands, some of which had "very, very deep pockets, because they were backed by Coke and Pepsi and PE firms[.]").

44. Dr. James Roberts, Tortilla Factory's consumer survey expert, (see Dkt. 348, PTCO at ¶¶ 21-22), opined that "alcohol warning labels . . . not only [on] Kombucha products but all products lead to higher or more negative attitudes toward that product" and, "when you compare a product with an alcohol warning label, such as Kombucha Dog up against GT's Enlightened, you can expect sales [sic] or less choices."[6] (Dkt. 367, RT II at 126); (id. at 103-04) (Dr. Roberts testified that he was asked to "determine that impact that an alcohol warning label may have on the decision to purchase Kombucha product" and that he utilized a "multi-mixed method approach to data collection where [he] did not only consume [sic] a survey but also two quasi-experiments").

45. GT's expert, John Hansen, who rebutted Dr. Robert's conclusions, opined that there was no "basis [for Dr. Roberts] to determine or conclude that in the real world Tortilla Factory lost sales due to the lack of [a] Government warning label on GT's Enlightened product." (Dkt. 367, RT II at 198). Mr. Hansen noted that Dr. Robert's conclusions "fail[ed] to consider numerous factors that one would have to analyze to determine whether or not an actual lost sale occurred[,]" including "lots of alternatives that would be competing for those sales[.]" (Id.). He explained that

---

[6] Dr. Roberts also opined that when you compare Kombucha Dog against GT's Classic, it "evens the playing field," resulting in a sales increase of Kombucha Dog. (Dkt. 367, RT II at 127). But this conclusion is a little suspect given the manner in which Dr. Roberts compared Kombucha Dog with GT's Classic. Dr. Roberts showed the survey group the front of a Kombucha Dog bottle (with images of the puppies), while he only showed the back and side of GT's Classic bottle. (See Dkt. 367, RT II at 121-22); (Exh. 161). When asked why he did that, Dr. Roberts stated that there would be too much familiarity with GT's bottle. (Dkt. 367, RT II at 122). However, Dr. Roberts also stated that he showed the front of a Kombucha Dog bottle because he "wanted to give people kind of a feel – a better feel for the product." (Id.). He conceded on cross-examination that showing survey respondents "the photo of a cute dog could inject bias into the result[.]" (Id. at 131).

9

"if the lack of a Government warning label was a purchase driver[,] . . . there would have been numerous alternatives that were also nonalcoholic and didn't have the Government warning label that would have been available for that customer to purchase [.]" (Id. at 199-200).

46. In other words, if a consumer would be deterred from purchasing Enlightened because, as plaintiff claims, it carried the alcohol warning label, the consumer would also be deterred from purchasing Kombucha Dog. Indeed, Tortilla Factory makes this point when it argues that GT's contention that its larger number of flavors, greater retail availability, and "other similar factors" contributed to Tortilla Factory's poor financial performance "puts the cart before the horse." (Dkt. 369, TF Memo. at 22). According to Tortilla Factory, consumer decisions regarding flavor and similar factors "are made after the consumer has already decided whether to purchase alcoholic or non-alcoholic kombucha." (Id.) (emphasis in original).

47. In short, the court finds that Tortilla Factory has failed to show competitive harm proximately caused by GT's representations regarding the alcohol content of its Enlightened products and the lack of a government alcohol warning label.[7]

---

[7] Because Tortilla Factory's position is that the alcohol warning label (or even the amount of alcohol) is the driving factor in a kombucha consumer's purchasing decision, (see Dkt. 369, TF Memo. at 22), and given the court's finding with respect to the lack of harm suffered as a result of the lack of a warning label, the court's finding also dooms Tortilla Factory's contentions regarding sugar in Enlightened products. In other words, even if Enlightened disclosed a higher sugar content, consumers would not have purchased Kombucha Dog, but instead, would have purchased an alternative non-alcoholic kombucha beverage. (See Dkt. 363, RT I at 75-76); (see also Dkt. 367, RT II at 39). Moreover, Tortilla Factory did not produce any expert testimony or survey results regarding the impact of sugar labels on consumer choices with respect to kombucha. (See Dkt. 367, RT II at 135). And while Mr. Faye testified that in 2014, after Tortilla Factory began placing nutrition labels on Kombucha Dog that disclosed six grams of sugar, (Dkt. 363, RT I at 49), "they had many discussions with consumers who thought that [Tortilla Factory's] product had three times the amount of sugar than GT's did[,]" (id.), the court did not find Mr. Faye's testimony credible. Further, Tortilla Factory did not identify any consumer, retailer, or distributor that refrained from purchasing or distributing Kombucha Dog based on a higher level of sugar content. (See, generally, Dkt. 369, TF Memo. at 19-23).

With respect to GT's Classic kombucha, Tortilla Factory did not introduce any sugar test results related to these products. Instead, Tortilla Factory relied on Mr. Ebersole's 2016 and 2019 tests, which were limited to the Enlightened products. (See Dkt. 363, RT I at 183); (Exh. 311, Summary of Sugar Test Results for 2016 & 2019); (Dkt. 370-1, Plaintiff Tortilla Factory, LLC's [Proposed] Findings of Fact and Conclusions of Law Re: Liability ("TF FF") at ¶¶ 79 & 83); (see

C. Specific Customer Accounts.

48. In an effort to show competitive harm, Tortilla Factory points to four customers it contends were lost because of GT's false advertising regarding the alcohol content of its Enlightened kombucha drinks: (1) Tender Greens; (2) Lightning in a Bottle; (3) Jimbo's; and (4) Café Gratitude. (Dkt. 369, TF Memo. at 9-10, 20-22); (see also Dkt. 375, Plaintiff Tortilla Factory, LLC's Opposition Memorandum of Points and Authorities Re: Bench Trial – Liability ("TF Reply") at 12-14).

49. As an initial matter, Tortilla Factory did not produce any witnesses from any of the four customers to testify as to why they no longer sold or carried Kombucha Dog and/or why they sold GT's Enlightened products.[8] (See, generally, Dkt. 363, RT I); (Dkt. 367, RT II). Instead, Tortilla Factory relied primarily on the testimony of Mr. Faye, which the court found to be largely speculative.

50. In any event, with respect to Tender Greens and Lightning in the Bottle, GT's did not sell Enlightened kombucha in bottles, but instead provided its kombucha in kegs. (See Dkt. 367, RT II at 71-72) (Mr. Dave testifying that GT's supplied Tender Greens with kegs); (id. at 92) (Mr. Dave agreeing with defense counsel that "Enlightened was sold through the keg" at Tender

---

also Dkt. 373-1, GT's Living Foods, LLC's [Proposed] Findings of Fact and Conclusions of Law at ¶ 63); (id. at ¶ 67). Tortilla Factory also relied on two bottles of Classic kombucha that were purchased on the same date and at the same store with the same "enjoy by" date that had different amounts of sugar disclosed. (See Dkt. 363, RT I at 64-65); (Exh. 26, Photo of bottle labels). However, Mr. Dave provided an explanation for that labeling. (See Dkt. 367, RT II at 69-70). But even without that explanation, a single example of a labeling inconsistency is insufficient to show that GT's falsely labeled the amount of sugar in its Classic kombucha drinks or that Tortilla Factory suffered competitive harm as a result of that single instance. In short, Tortilla Factory has failed to prove that it suffered any competitive harm as a result of GT's sugar labeling with respect to both the Enlightened and Classic kombucha products. See Lexmark, 572 U.S. at 133, 134 S.Ct. at 1391.

[8] Such testimony could have helped clear up vague testimony regarding, for example, Tortilla Factory's business relationship with Tender Greens. Mr. Faye never testified that Tender Greens made the decision to stop carrying Kombucha Dog. (See, generally, Dkt. 363, RT I at 67-68). Instead, he merely stated that Tender Greens asked Tortilla Factory if it "could match marketing dollars" but Mr. Faye believed that "federal alcoholic [sic] [laws] prohibit[ed]" Tortilla Factory from "offering a retailer marketing dollar[s]." (Id.).

11

Greens); (see id. at 74-75) (Mr. Dave testifying that GT's used kegs at the Lightning in the Bottle festival, which came directly from GT's facility); (id. at 92) (Enlightened was sold through kegs at Lightning in the Bottle).  And there are no test results or other evidence to establish that the alcohol level in the Enlightened kombucha supplied in kegs to Tender Greens or Lightning in the Bottle exceeded 0.5% ABV.  (See, generally, Dkt. 363, RT I); (Dkt. 367, RT II); (Dkt. 369, TF Memo.); (Dkt. 363, RT I at 212-213) (Dr. Ebersole not aware of testing done at Lightning in a Bottle or Tender Greens).

51. However, even if GT's sold its Enlightened kombucha in bottles to Tender Greens and Lighting in a Bottle, Tortilla Factory still failed to show competitive harm.  With respect to Lightning in the Bottle, GT's sold Enlightened flavors that were specifically developed for the 2016 and 2017 festivals.[9]  (See Dkt. 367, RT II at 75-76).  Moreover, because Tortilla Factory did not produce a witness from Lightning in the Bottle, Tortilla Factory's contention that if GT's had not agreed to the exclusivity agreement, (see Dkt. 363, RT I at 252), Tortilla Factory would have continued to sell at the festival is speculative.  As noted above, GT's is not the only kombucha brand marketed as nonalcoholic.  Thus, if Lightning in the Bottle wanted a kombucha producer to sign an exclusivity agreement, (see id.) (Mr. Dave testifying that the exclusivity provision was "offered as part of the expense of doing the sponsorship" and that he did not "recall [GT's] initiating the request"), it had countless other nonalcoholic kombucha alternatives to choose from.  (See id. at 75-76) ("Q: There are many Kombucha brands in L.A. that are not marketed as alcoholic beverages, correct?  A: Yes.  Q:  More than just GT's, correct?  A:  Yes."); (see also Dkt. 367, RT II at 39) (Mr. Dave testified that in 2013, there was an influx of kombucha brands, some of which had "very, very deep pockets, because they were backed by Coke and Pepsi and PE firms[.]").

52. With respect to Tender Greens, Tortilla Factory did not establish that GT's representations regarding the alcohol content of its Enlightened products proximately caused competitive harm to Tortilla Factory.  Tortilla Factory only produced evidence, via testimony from

---

[9] As noted earlier, the 2016 flavor, Golden Sage, has never been sold in retail, (Dkt. 367, RT II at 75), while the 2017 flavor, Liberty, is only sold seasonally.  (Id. at 76).

Mr. Faye, that Tender Greens asked Tortilla Factory to "match marketing dollars[,]" which Mr. Faye understood was prohibited by "federal alcoholic" laws.[10] (See Dkt. 363, RT I at 67-68). Mr Faye also testified that Tender Greens was conducting a product review, and ultimately selected GT's. (See id. at 125-26). At most, Tortilla Factory provided some evidence that subsequent to its decision to not offer "marketing dollars," Tender Greens sold GT's kombucha (see id. at 68) (Mr. Faye testimony that GT's replaced Tortilla Factory at Tender Greens); (id. at 125-26), and that GT's paid for menu boards. Tortilla Factory's characterization of the evidence appears to be based "on a theory of post hoc ergo propter hoc, i.e., 'after this, therefore because of this.'" A.L.S. Enterprises, Inc. v. Robinson Outdoor Products, LLC, 2017 WL 393307, *8 (W.D. Mich. 2017). But Tortilla Factory's characterization of the evidence is unpersuasive and insufficient, because even if Tender Greens required kombucha suppliers to provide "marketing dollars" and Tortilla Factory was disqualified because it did not provide such funds, that would not mean, given the number of other nonalcoholic kombucha products available, that GT's caused Tender Greens to oust Tortilla Factory. Indeed, Mr. Faye conceded that Tender Greens also sold Health-Ade, which is not marketed as an alcoholic product. (See Dkt. 363, RT I at 125-26). Also, Mr. Dave testified that GT's replaced Health-Ade at Tender Greens, not Kombucha Dog, (see Dkt. 367, RT II at 73) (Mr. Dave testimony that GT's replaced Health-Ade, not Kombucha Dog at Tender Greens), and that Tender Greens "sells more than one brand[.]" (Dkt. 363, RT I at 249). In other words, Tortilla Factory's evidence is insufficient to establish that GT's was the proximate cause of Tortilla Factory losing the Tender Greens account.

53. In short, Tortilla Factory has failed to show that it was harmed with respect to Tender Greens and Lightning in the Bottle as a result of GT's representations regarding the alcohol content of its Enlightened products or lack of a government alcohol label.

54. With respect to Jimbo's, Mr. Faye testified that Tortilla Factory sold Kombucha Dog in

---

[10] Mr. Faye's testimony was vague, including with respect to his response to Tender Green's request for marketing dollars. He testified that he knew that it "was against the Federal Alcohol Act," (see Dkt. 363, RT I at 136), but never indicated what his actual response was to Tender Green's request.

Jimbo's stores from "2014, maybe till as late as to 2017," (Dkt. 363, RT I at 69), but that "Jimbo's stopped supporting" Kombucha Dog because it wanted to offer in-store tastings, but did not have an on-premises alcohol consumption license. (See id. at 69-70) ("Jimbo's stopped supporting us throughout their five stores, because we couldn't do in-store tasting demos, which they wanted us to do. And that's because they didn't have an on-premises consumption license. So we – it was my – we were not allowed to do in-store tasting at any of the Jimbo's."). Mr. Faye stated that GT's replaced Kombucha Dog. (Id. at 69).

55. As an initial matter, the court did not find Mr. Faye's testimony regarding Jimbo's credible. Not only was it vague, but it was contradicted by Mr. Dave's testimony that GT's was selling at Jimbo's since 1999 – well before Kombucha Dog was even founded. (See Dkt. 367, RT II at 82) (Mr. Dave testifying that Jimbo's was one of GT's "early, early stores, even before Whole Foods"); (id. at 32) (Mr. Dave testifying that in 1999, GT's got into Whole Foods). In fact, Mr. Faye conceded on cross-examination that GT's was already selling at Jimbo's. (See Dkt. 363, RT I at 126) ("Q: And GT's was already in Jimbo's, correct? A: Yes.").

56. In addition, Jimbo's is identified as an account that went "cold" due to the disastrous distribution relationship with Young's Market. More specifically, Jimbo's is listed on a document identifying "Kombucha Dog accounts that Young's Market allowed to go cold[,]" (Dkt. 363, RT I at 115), meaning that Tortilla Factory had the account "before Young's came along, and then Young's came, and they let them go cold[.] Those accounts died[.]"[11] (Id. at 114-15); (id. at 118) (Mr. Faye stating that he "didn't know the particulars" regarding Jimbo's); (Exh. 33 at TF002160)

---

[11] GT's spends a great deal of time on Tortilla Factory's "disast[rous]" business relationship with Young's Market. (See Dkt. 372, GT's Memo. at 6-8, 9-10, 15 & 25). While the court agrees that the deal with Young's Market "kneecapped" Tortilla Factory's sales, (see id. at 8); (see Dkt. 363, RT I at 106) ("Q: Things were bad with Young's from the start, weren't they? A: Yes Q: And by 2017, the agreement [] was a disaster? A: Yes."); (id. at 119) ("Q: [T]he deal you signed with Young's almost put you out of business, correct? A: Perhaps, yes."); (Exhs. 88-89), Tortilla Factory does not need to prove, at the liability stage, that each lost sale was attributed to GT's conduct. Tortilla Factory need only show that it suffered or could suffer competitive harm. Tortilla Factory's tanked sales and lost customers as a result of its deal with Young's Market would have been a significant factor in assessing monetary relief, but since the court has determined that Tortilla Factory did not suffer competitive harm, the issue is moot.

(listing five Jimbo's accounts on document regarding Young's Cold Accounts).

57. Finally, even accepting Mr. Faye's testimony as credible, Tortilla Factory has failed to show that GT's representations about alcohol content or the labeling of its Enlightened products caused Tortilla Factory to lose the Jimbo's account. If Jimbo's did not sell Kombucha Dog because an alcohol consumption or similar license was required, (see Dkt. 363, RT I at 69-70), then there is no basis to find that Jimbo's decision had anything to do with GT's failure to label its Enlightened drinks with the alcohol warning label or passing its drinks off as nonalcoholic. This is particularly so given Tortilla Factory's acknowledgment that there are many kombucha brands in Los Angeles that are not marketed as alcoholic beverages. (See id. at 75-76); (see also Dkt. 367, RT II at 40) (Mr. Dave testifying that there are approximately 300 plus kombucha brands in the United States.).

58. For similar reasons, Tortilla Factory's contentions regarding Café Gratitude are unavailing. As an initial matter, given Mr. Faye's vague testimony, it is unclear whether Café Gratitude ever made the decision to stop selling Kombucha Dog. (See Dkt. 363, RT I at 68) ("Café Gratitude didn't have an off-premises alcohol license, and they were selling to-go. So once we found out that the license didn't match with their sales. We were replaced with GT's in the to-go kiosk[.]"); (see id. at 141-43). But based on its post-trial briefing, it appears that Tortilla Factory is contending that it (rather than Café Gratitude) made the decision to stop selling Kombucha Dog to Café Gratitude because Café Gratitude did not have the proper license. (See Dkt. 369, TF Memo. at 10) ("Tortilla Factory could no longer permit their product to be sold in violation of the alcohol laws, and Café Gratitude replaced Kombucha Dog in its to-go kiosk with GT's Enlightened, which is improperly labeled as non-alcoholic.").

59. As with Jimbo's, Mr. Faye's testimony regarding Café Gratitude is not credible. Like Jimbo's, Café Gratitude is also listed as a Young's Market cold case. (See Dkt. 363, RT I at 114-15); (Exh. 33 at TF002157). When confronted with this fact, Mr. Faye offered an equivocal response: "I think that was a – more of an issue based on on-premises and off-premises licensing. . . . Café Gratitude didn't have the correct licensing for off-premises sales." (Dkt. 363, RT I at 115). But if Café Gratitude did not have the proper license to sell alcoholic beverages in

its to-go kiosk, then it could not sell Kombucha Dog. And that cannot be attributed to GT's representations regarding the alcohol content of its Enlightened products. In other words, GT's was not the cause of either Tortilla Factory's or Café Gratitude's decision.[12]

60. In short, Tortilla Factory has not proved "economic or reputational injury flowing directly from deception wrought by [GT's] advertising[.]" Lexmark, 572 U.S. at 133, 134 S.Ct. at 1391.

II. LIABILITY UNDER THE UCL.

61. The UCL prohibits "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]" Cal. Bus. & Prof. Code § 17200.[13] Tortilla Factory has proceeded under the unlawful and false advertising prongs. (See Dkt. 348, PTCO at ¶ 7(a)).

62. With respect to the unlawful prong, § 17200 "borrows violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable." Chabner v. United Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000) (internal quotation marks omitted).

63. In addition to proving that a defendant has violated the UCL, a plaintiff must also prove that it has "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. In other words, a plaintiff must establish standing to bring a UCL claim. See Kwikset Corp. v. Superior Court, 51 Cal.4th 310, 318 (2011) (referring to § 17204 as standing provision).

64. To establish standing under the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." Kwikset Corp., 51 Cal.4th at 322 (emphasis in original).

65. "There are innumerable ways in which economic injury from unfair competition may be shown. A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than

---

[12] In its post-trial brief, Tortilla Factory refers to market distortion allegedly caused by GT's. (See Dkt. 369, TF Memo. at 22). However, Tortilla Factory did not present any evidence of such market distortion. (See, generally, Dkt. 363, RT I); (Dkt. 367, RT II). Nor did it include such a theory in the Pretrial Conference Order. (See, generally, Dkt. 348, PTCO).

[13] Although Tortilla Factory also cites to Cal. Bus. & Prof. Code § 17500, California's false advertising law, (see Dkt. 369, TF Memo. at 23); (Dkt. 370-1, TF FF at ¶ 158), the SAC does not bring such a claim or reference that statute in its UCL cause of action. (See Dkt. 34, SAC at ¶¶ 77-84). Nor does the PTCO. (See, generally, Dkt. 348, PTCO at ¶ 7(a)).

he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary." Kwikset Corp., 51 Cal.4th at 323.

66. Here, Tortilla Factory relies on the same evidence and arguments as it did with respect to the Lanham Act claim. (See Dkt. 369, TF Memo. at 24) ("As set forth in Section III.G, supra, Tortilla Factory has established that it suffered economic injury from GT's misrepresentations[.]"); (Dkt. 370-1, TF FF at ¶¶ 163-65). And for the reasons set forth above, Tortilla Factory has failed to show it suffered a loss or deprivation of money or property that was caused by GT's alleged false advertising.

## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT judgment shall be entered in favor of defendant.

Dated this 27th day of September, 2023.

/s/
Fernando M. Olguin
United States District Judge